UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACESHUNN BROWN, | **MEMORANDUM, ORDER, FINDINGS OF FACT AND LAW, AND JUDGMENT** |
| Plaintiff, | |
| – against – | 08-CV-351 |
| WARDON CAMERON LINDSAY, GUARD REED, and LIEUTENANT RIVERA, | **FILED** |
| | IN CLERK'S OFFICE |
| Defendants. | U.S. DISTRICT COURT E.D.N.Y |
| | ★ MAR 1 9 2010 ★ |
| ACESHUNN BROWN, | BROOKLYN OFFICE |
| Plaintiff, | |
| – against – | 08-CV-2182 |
| CORRECTIONAL OFFICER SHAWN LIDICKER and WARDON CAMERON LINDSAY, | |
| Defendants. | |

**JACK B. WEINSTEIN, Senior United States District Judge:**

Appearances:

For Plaintiff:     ALAN NELSON, Esq.
                  3000 Marcus Avenue
                  Lake Success, NY 11042
                  (516) 328-6200

For Defendants:   United States Attorney's Office
                  271 Cadman Plaza East
                  Brooklyn, NY 11201
                  BY:    TIANA A. DEMAS, Esq.

1

**Table of Contents**

I.    Introduction .............................................................................................................3

II.   General Allegations ..................................................................................................4

III.  Position of the Government .....................................................................................4

IV.   The Trial .................................................................................................................5

  A.   Plaintiff's Disciplinary History at the MDC.........................................................9

  B.   November 16, 2007 ...........................................................................................11

  C.   April 22, 2008....................................................................................................17

V.   FTCA Claims..........................................................................................................23

  A.   Law ....................................................................................................................23

    1.   Standard of Proof .........................................................................................23

    2.   FTCA............................................................................................................23

    3.   Assault and Battery ......................................................................................25

    4.   Negligence....................................................................................................25

  B.   Application of Law to Facts ...............................................................................26

    1.   Assault and Battery ......................................................................................26

    2.   Negligence....................................................................................................27

VI.   *Bivens* Claims .......................................................................................................28

  A.   Law ....................................................................................................................28

    1.   Summary Judgment.......................................................................................28

    2.   Claims for Constitutional Violations.............................................................29

    1.   Sovereign and Qualified Immunity ...............................................................31

  B.   Application of Law to Facts ...............................................................................32

    1.   Claims for Constitutional Violations.............................................................32

      a)   November 16, 2007 Incident ....................................................................32

      a)   April 22, 2008 Incident............................................................................33

    2.   Sovereign and Qualified Immunity ...............................................................33

VII.  Conclusion..............................................................................................................34

## I.    Introduction

Plaintiff Aceshunn Brown is serving a mandatory minimum sentence of fifteen years following a plea of guilty to felon-in-possession charges based on possession of a gun. *See* 18 U.S.C. §§ 922(g)(1), 924(e)(1). He pled guilty on January 7, 2008, and sentence was imposed on April 21, 2008. *United States v. Brown*, No. 07-CR-202, 2008 WL 1945365, at *1 (E.D.N.Y. Apr. 29, 2008).

The two instant actions, filed *pro se*, claim injuries intentionally or negligently inflicted by corrections officers in the Metropolitan Detention Center, Brooklyn ("MDC"). Failure to provide adequate medical care is also alleged. The incidents that are the subject of plaintiff's claims both involve the food service slots used to pass meals and other items through the doors of MDC inmates' cells.

Because both complaints were filed *pro se*, the court construed them liberally. They were understood to state claims for intentional torts or negligence under the Federal Tort Claims Act ("FTCA"), and for constitutional violations consisting of deliberate indifference and failure to provide medical care under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Counsel was appointed to represent plaintiff. He served in the highest tradition of the bar, prepared the case thoroughly, and provided excellent representation.

Prior to trial, the government moved for dismissal or summary judgment on all claims in both actions. Decision on the governments' motions was reserved. *See* Aug. 10, 2009 Order, 08-CV-351, Docket Entry No. 63; Aug. 10 2009 Order, 08-CV-2182, Docket Entry No. 28.

The FTCA claims were tried by the court. By stipulation of the parties, the trial evidence was considered in connection with the government's summary judgment motions with respect to the *Bivens* claims.

These findings of fact and conclusions of law are made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure following a bench trial. *See* 28 U.S.C. § 2402. They support dismissal of both actions.

## II.     General Allegations

In *Brown v. Lindsay*, plaintiff alleges that in violation of the FTCA on November 16, 2007, Corrections Officer Brock Reed intentionally and incorrectly operated the food service slot on plaintiff's cell at the MDC, causing an injury to plaintiff's right index and middle fingers. Defendants Reed, Rivera, and Lindsay are alleged to have been deliberately indifferent to plaintiff's medical needs in denying immediate medical attention for his finger injuries. Compl., No. 08-CV-351, Docket Entry No. 1.

In *Brown v. Lidicker*, plaintiff claims that in violation of the Constitution on April 22, 2008, Senior Officer Specialist Shawn Lidicker intentionally closed one of the doors to the biohazard slot on plaintiff's left wrist, causing an injury. Denial of medical treatment is alleged. Compl. No. 08-CV-2182, Docket Entry No. 1.

## III.     Position of the Government

The court is said by the government to lack subject matter jurisdiction over the FTCA causes of action because plaintiff never properly submitted his administrative claims to the Federal Bureau of Prisons, the appropriate federal agency. *See* 28 U.S.C. § 2675(a). In the alternative, it is contended that the evidence shows that no tort was committed in connection with

4

either of the incidents that are the bases for plaintiff's claims. The corrections officers involved in the incidents are claimed to have acted properly and without negligence or tortious intent.

With respect to plaintiff's *Bivens* claims, the court is said to lack subject matter jurisdiction because plaintiff has sued the individual defendants in their official capacities only, and claims against the United States are barred by sovereign immunity. In the alternative, the government argues that summary judgment is warranted because plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act. Plaintiff's claims against MDC Warden Cameron Lindsay fail, according to the government, because the Warden did not participate in the alleged constitutional violations. *Bivens* claims against the corrections officers are said to fail because the officers are entitled to qualified immunity.

Because plaintiff's claims are found to fail on the merits—resulting in a judgment in the government's favor on the FTCA claims, and grant of the government's motion for summary judgment on the *Bivens* claims—it is not necessary to consider the government's subject matter jurisdiction arguments.

## IV.     The Trial

On November 16, 2007, and April 22, 2008, plaintiff was housed in the MDC's Special Housing Unit ("SHU"). Tr. 19:4-16, 58:15-22. SHU inmates are allowed five hours of recreation time per week outside of their cells. The remainder of a SHU inmate's time is spent inside a locked cell. *See* Tr. 52:19–53:6. Inmates in the SHU must be handcuffed whenever they are moved from their cells to different parts of the institution. Tr. 62:22-24. They are handcuffed through a rectangular slot on each cell door, which is approximately one and one half feet wide. *See* Tr. 33:22-34:3; 65:2-8; Gov't Exhs. A-1, A-2 (photographs from outside of cell

5

doors of biohazard slots in closed an open positions, respectively). Meals and other items are delivered through this same rectangular opening. *See* Tr. 21:16-22:14.

On November 16, 2007 and April 22, 2008, plaintiff had a "biohazard slot" affixed to the rectangular opening on his cell door. Tr. 59:7-25; 105:21-25; *see also* Gov't Exhs. A-1, A-2, G-1, H-3 (photographs of biohazard slots). Biohazard slots are provided for the safety of staff and officers, in part to prevent inmates from spitting or throwing food, urine, or feces at prison staff. Tr. 150:24-25, 162:21-163:16. The biohazard slot is also known as an "assault box," an "extended food slot," and a "high security box." Tr. 113:14-18, 135:23-136:2, 211:2-4.

The biohazard slot is affixed to the outside of the rectangular opening on the SHU cell door so that it extends into the hallway of the SHU. *See* Gov't Exhs. A-1, G-1 (photographs of biohazard slots). It consists of a metal trapezoidal box with two doors. *See id.* Photographs were submitted of a biohazard slot similar to the slots involved in the incidents of which plaintiff complains, with doors in the closed and open positions:

## Photograph A

### Outside of Cell, Slot Closed



Gov't Exh. A-1.



Gov't Exh. A-2; *see also* Gov't Exhs. G-1, H-3.

The first door, a metal slide that runs along a ratcheted metal track, is flush to the cell door. *See id.* Upon inserting a key into a lock at the side of the metal slide, the slide can be pulled open and pushed closed. *See* Tr. 299:8-300:3; *see also* Gov't Exhs. A-2, H-3. If the key is taken out of the lock, the metal slide still can be pushed closed, but it cannot be pulled open further because a ratcheting mechanism immediately locks, preventing the slide from opening. Tr. 283:3-284:11; *see also* Gov't Exhs. A-2, H-3.

A metal shelf or tray is affixed beneath the sliding door, and extends approximately one foot outward into the hallway of the SHU. *See* Gov't Exhs. A-1, A-2, G-1, H-3; *see also* Tr.

34:4-12. The metal shelf has a horizontal rectangular surface and two vertical trapezoidal sides perpendicular to the cell door. *See* Gov't Exhs. A-1, A-2, G-1, H-3.

A plexiglas door or hatch is attached by a hinge to the edge of the metal shelf that is farthest from the cell door. *See* Gov't Exhs. A-1, A-2, G-1, H-3. When closed, the plexiglas hatch completely covers the metal shelf at an angle of about 30 degrees from horizontal. *See id.* The closed plexiglas hatch is locked to the portion of the cell door that is directly above the metal slide. *See id.*

Like the metal slide, the plexiglas hatch must be opened with a key. *See id.*; Tr. 143:18-21, 168:5-11. The lock is located at the top middle of the hatch, *see* Gov't Exhs. A-1, G-1, and is opened with the same key that opens the metal slide. Tr. 143:11-21. After inserting a key into the hatch lock, the key in the lock may be used as a handle to pull the hatch open. Tr. 168:5-11.

When opened, the hatch swings on its hinge up from the metal tray, away from the cell door. *See* Gov't Exhs. A-1, A-2, G-1, H-3. The plexiglas hatch can be swung up to 270 degrees from its starting position. *See* Gov't Exhs. A-2, H-3. When fully open, the hatch hangs down from the edge of the metal tray, perpendicular to the floor. *See id.*

There are no written policies dictating the method by which correctional officers must open and close biohazard slots. Tr. 150:17-151:6. Correctional officers are permitted to use their discretion in operating these openings. Tr. 151:1-6.

### A.    Plaintiff's Disciplinary History at the MDC

Plaintiff admitted to having an extensive disciplinary history at the MDC. *See* Tr. 100:21-101:6 & Gov't Exh. E (incident reports and documents relating to disciplinary proceedings concerning plaintiff). He contended that many of the incidents for which he was

9

sanctioned had not occurred in the manner reflected in his disciplinary records. *See, e.g.*, Tr. 117:2-118:22; 122:9-17, 127:1-3.

On November 14, 2007—two days prior the first incident of which plaintiff complains— plaintiff was forcibly removed from his cell for refusing to return handcuffs to a correctional officer. Tr. 102:3-16. He had prevented an officer who escorted him back to his cell from fully removing his handcuffs, leaving plaintiff in his cell with one cuff attached to his wrist and the other hanging down. Tr. 101:20-102:10; Gov't Exh. E at USA 260.

He refused to return the handcuffs because, he said, he wanted certain papers to be returned to him. Tr. 102:17-19. He told the officer: "When I get my legal work, you can have your handcuffs back." Tr. 102:20-24. Plaintiff knew that it was a violation of prison rules to keep handcuffs in the cell with him. Tr. 102:11-14. He admitted that he broke prison rules in order to get back his legal materials. Tr. 102:25-103:13. A squad of officers forcibly removed the handcuffs. Tr. 103:14-18; Gov't Exh. E at USA 266-67. He received additional segregation time in the SHU. Tr. 103:19-25. He also lost good conduct time, which meant that he would stay in prison longer. Tr. 104:1-7, 122:5-8. After the November 14, 2007 incident, plaintiff was placed in a cell with a biohazard slot. Tr. 104:18-21.

Other incidents in plaintiff's disciplinary history include the following: On December 25, 2007 plaintiff kicked an officer. *See* Tr. 121:12-25; Gov't Exh. E at USA 316. As a result, plaintiff received 30 days of disciplinary segregation and lost 27 days of good conduct time. Tr. 121:23-122:4; Gov't Exh. E at USA 317. On January 3, 2008, a correctional officer found a jar of mayonnaise filled with a combination of urine and feces in plaintiff's cell. Tr. 118:6-18; Gov't Exh. E. at USA 335-337. As a result of this infraction, plaintiff received 35 days of

10

disciplinary segregation and lost 40 days of good conduct time. Gov't Exh. E at USA 337. Plaintiff was found to have made improper comments to a female case manager on February 6, 2008. Tr. 122:13-17; Gov't Exh. E at USA 363. Plaintiff received 30 days of disciplinary segregation for the incident. Gov't Exh. E at USA365.

### B.    November 16, 2007

On November 16, 2007, plaintiff was housed in cell 918 on Range 1 of the SHU. Tr. 19:24-20:1. Cell 918 was equipped with a biohazard slot. Correctional Officer Reed was assigned to the MDC SHU for the four o'clock to midnight shift. Tr. 135:1-11. Prior to the night of November 16, 2007, Officer Reed had never had any interaction with plaintiff. *See* Tr. 134:20-24. This officer had no prior knowledge of plaintiff's "assaultive history." Tr. 165:24-166:2.

At approximately 6:00 p.m. on November 16, 2007, Officer Reed approached plaintiff's cell with a wheeled food cart to deliver plaintiff's dinner. Tr. 29:25-30:9, 135:15-20, 136:9-11. The dinner consisted of a cold tray and a hot tray. *See* Tr. 137:10-16. Officer Reed unlocked the plexiglas hatch of the biohazard slot. *See* Tr. 136:11-16. The biohazard slot key was attached to a chain; the chain, in turn, was attached to Officer Reed's belt. Tr. 146:11-16. After opening the plexiglas hatch, Officer Reed placed a cold tray on the metal shelf of the biohazard slot. Tr. 136:9-25. He then closed the plexiglas hatch and locked it with his key. Tr. 137:4-6. At this point, the metal slide door of the biohazard slot was still closed. Tr. 136:17-19. Officer Reed removed the key from the plexiglas hatch and used it to unlock the metal slide and open it. *See* Tr. 137:4-7. Plaintiff took the cold tray into his cell and placed it on the floor next to him. Tr.

11

107:15-18. Officer Reed closed the metal slide, leaving both doors to the biohazard slot secured. Tr. 138:3-17.

Officer Reed testified that he repeated the same process with the hot tray: he opened the plexiglas hatch, placed the hot tray on the metal shelf, closed and secured the plexiglas hatch, then opened the metal slide so that plaintiff could retrieve the hot meal, and finally closed the metal slide. Tr. 138:15-23, 139:24-140:1.

Plaintiff testified that Officer Reed followed a different procedure with the hot tray. *See* Tr. 31:3-12; 32:19-21. He claimed that Officer Reed left the plexiglass hatch open when he opened up the metal slide door, so that plaintiff was able to reach from inside his cell through the biohazard box into the hallway. Tr. 32:19-21

After plaintiff retrieved the hot tray into the cell, he held the hot tray up to the window on his cell door and said: "This isn't my food." Tr. 138:18-139:2. Plaintiff said that his meal "should have his name and number on it." Tr. 139:5-7. Officer Reed searched the food cart, but did not find any meal labeled with plaintiff's name or number. Tr. 139:8-15, 140:16-24. Plaintiff stated that he needed a "no meat/no fish" meal. *See* Tr. 139:16-23;140:25-141:4.

Officer Reed recalled seeing a "no meat/no fish" tray in the kitchen at the other end of the SHU. Tr. 141:5-22. Officer Reed told plaintiff that "I know where his meal is and I can go get it." 141:25-142:2. Plaintiff was asked to return the hot meal tray. Tr. 155:21-156:3.

As to the next event, the officer's account was generally consistent with plaintiff's testimony. *See* Tr. 112:13-113:4. Officer Reed opened the metal sliding door on the biohazard slot. Tr. 142:14-15. Plaintiff placed the tray onto the shelf of the food slot, but he continued to hold onto the tray. Tr. 142:15-17. Plaintiff's arm was therefore in the path of the metal slide,

12

preventing Officer Reed from closing it. Tr. 142:1-143:7. Officer Reed told plaintiff: "You need to move your hand so I can close this." Tr. 143:8-9. Officer Reed testified that plaintiff did not remove his hand, but simply stared at Officer Reed. *Id.*

Officer Reed removed his key from the metal slide and unlocked and opened the plexiglas door. Tr. 143:10-21. He used the key like a handle to pull the plexiglas door open, so that the opened hatch was leaning against him at an angle between 90 and 180 degrees from its starting position. Tr. 143:20-145:2, 168:2-11, 175:16-23. At this point, the metal slide door and the plexiglas hatch were both open. Officer Reed continued to hold the key in the plexiglas door with his right hand as he reached his left hand into the biohazard slot to retrieve the tray. Tr. 169:3-10. Plaintiff let go of the tray. Tr. 169:8-13.

Plaintiff moved his right hand to the side of the biohazard slot, placing his fingers over the side of the biohazard unit. Tr. 40:8-11, 40:14-24 & Pl. Exh. 2; Tr. 113:10-13. Plaintiff's hand was thus blocking both the metal slide and the plexiglas hatch from closing. Tr. 170:24-171:5; *see* Tr. 40:14-24 & Pl. Exh. 2. Officer Reed testified: "If an inmate puts his arm out of the slot, you have to basically stop what you're doing and go report it to the officer in charge." Tr. 144:14-20; *see* Tr. 144:18-20, 171:6-10.

Plaintiff agreed in his testimony that "inmates in the SHU are not allowed to stick their hands or other parts of their body outside of the assault boxes," i.e. the biohazard slots. Tr. 115:20-23. When the metal slide and the plexiglas hatch were open, plaintiff viewed this as an opportunity to "stop an officer from closing the slot." *See* Tr. 32:10-18. Plaintiff stated that he intentionally put his hand outside of the biohazard slot in order to prevent it from being closed, and that he was aware that he could get "written up" for doing this. Tr. 113:19-22, 116:1-7.

13

The key to the plexiglas hatch remained in the lock; the key was attached to Officer

Reed's belt by a chain. Tr. 145:7-8, 146:11-13. In order to leave the unit to report plaintiff's

infraction to the officer in charge ("OIC"), Officer Reed had to remove his key from the lock.

Tr. 146:5-16.

Still holding the tray in his left hand, Officer Reed attempted to remove the key with his

right hand. *See* Tr. 145:16-25. When the key did not come out of the lock, Officer Reed tried to

jiggle the key free. Tr. 145:22-146:4. As Officer Reed did this, the plexiglas cover remained

leaning toward him, away from the cell door. Tr. 173:15-18.

Plaintiff was looking toward the sink in his cell, away from Officer Reed. *See* Tr. 114:2-

12. He was reaching for a Styrofoam cup full of mayonnaise sitting on the sink, which, he said,

he intended to give to Officer Reed to pass to the inmate next door. Tr. 42:13-20, 43:8-12,

114:9-115:10. As a result, plaintiff did not observe the angle at which the plexiglas door was

leaning while Officer Reed tried to remove the key. *See* Tr. 115:3-19.

Officer Reed was eventually able to free the key from the lock. Tr. 173:19-21. When the

key came free, the plexiglas cover fell forward into the closed position. Tr. 147:10-12, 149:4-22.

Plaintiff testified that at the time the plexiglas hatch fell forward, his fingers were still on the side

of the metal shelving unit and therefore were hit by the falling plexiglas hatch. *See* Tr. 114:2-12.

Plaintiff claims that the hatch fell onto his right middle and index fingers. Tr. 43:17-22. Officer

Reed did not observe the plexiglas hatch make contact with any part of plaintiff's body. Tr.

147:16-18.

Officer Reed did not think that the plexiglas hatch would fall forward because it had been

leaning toward his body and away from the cell door. Tr. 152:8-18. Officer Reed did not intend

for the plexiglas hatch to make contact with any part of plaintiff's body. His intention was to remove the key from the plexiglas hatch, not to close the hatch. Tr. 149:8-10, 182:9-13, 154:3-5, 181:21-182:2. Plaintiff could not say whether or not Officer Reed intentionally closed the plexiglas hatch on his fingers because plaintiff was focused on the cup of mayonnaise in his cell. Tr. 115:3-14. Plaintiff did not observe either Officer Reed's demeanor or the position of the plexiglas hatch immediately before the hatch fell forward. *Id.*

Because Officer Reed had never interacted with plaintiff before November 16, 2007, Tr. 153:10-12, his testimony that he bore no animus toward plaintiff was credible. Tr. 153:13-15. He was, he said, not upset by an insolent tone or other action of the plaintiff, Tr. 153:22-24, he had no reason to punish plaintiff, Tr. 153:16-18, and he did not attempt to hurt plaintiff. Tr. 153:19-21.

Shortly after the plexiglas hatch fell forward, Officer Reed heard plaintiff scream. Tr. 148:23-149:3, 180:3-4. He looked through the window of plaintiff's cell and saw plaintiff on the floor. Tr. 150:8-9. Officer Reed informed plaintiff that he would notify the OIC. Tr. 150:9-10. He locked the plexiglas hatch and left to report the incident. Tr. 150:11-15, 151:7-12. After Officer Reed reported the incident to the OIC, plaintiff was examined by Mid-Level Practitioner ("MLP") John Saint-Preux. Tr. 45:12-46:16; Gov't Exh. D at USA 117.

In his report MLP Saint-Preux noted "no swelling, no deformity," and "limited flexion with [complaint of] pain at PIP [joint] and dorsum" of the second and third proximal phalanges. Gov't Exh. D at USA 117. He did not observe any broken skin or discoloration. Tr. 194:13-14. The report's conclusions were based in part on testing the range of motion of plaintiff's second and third fingers as well as on plaintiff's self-reported pain. *See* Tr. 250:5-20.

15

As a precaution, MLP Saint-Preux splinted plaintiff's two fingers. Tr. 251:21. MLP Saint-Preux explained that when he described plaintiff's fingers as having a "contusion" in his report, *see* Gov. Exh. D, at USA 117, he based this preliminary diagnosis on plaintiff's complaints of pain. Tr. 195:20-25. To determine whether plaintiff might have suffered a fracture, MLP Saint-Preux made an x-ray appointment for November 23, 2007. Tr. 251:19-252:13; Gov't Exh. D at USA 119. Plaintiff did not show up for this appointment. See Gov't Exh. D at USA 119.

MLP Saint-Preux examined plaintiff again on December 3, 2007, due to plaintiff's unrelated complaints of chest pain. Tr. 50:16-18. It was determined that the splints could be removed. Tr. 51:9-10. MLP Saint-Preux tried to assess the range of motion of plaintiff's fingers. Tr. 256:17-20. MLP Saint-Preux noted in a report that plaintiff was "forcefully keeping fingers extended as I attempt to flex them." Gov't Exh. D at USA 118. He testified that there was no medical explanation for plaintiff's two fingers to be fixed in an extended position. *See* Tr. 257:5-10.

Plaintiff testified that at the time that he was examined by MLP Saint Preux for the second time on December 3, 2007 he could not bend his fingers, and he "couldn't grab a pen to write with." Tr. 51:23-24. But he admitted to having handwritten and signed a form "Request for Administrative Remedy" more than a week before, on November 25, 2007. Tr. 98:2-10; *see also* Gov't Exh. N (plaintiff's November 25, 2007 BP-9 form).

After plaintiff did not appear for his first x-ray appointment, MLP Saint-Preux scheduled another x-ray appointment for December 5, 2007. See Tr. 257:23 – 258:7. In order for plaintiff, a SHU inmate, to be x-rayed, the Health Services unit had to be locked down and closed to

inmates in the general population. Tr. 258:3-259:10. While Health Services is on lockdown, the medical staff can only see patients from the SHU, disrupting normal services. Tr. 259:11-17.

On December 5, 2007, plaintiff refused to have his right hand x-rayed because he "prefer[red] to go to [the] rec[reation] deck." Tr. 258:2-260:15; Gov't Exh. D at USA 120-21. He testified that when a lieutenant asked him whether he wanted to go down for x-rays, plaintiff replied: "let me finish my rec." See Tr. 52:13-18.

After learning that plaintiff had refused x-rays, MLP Saint-Preux went to the SHU to speak to him. Tr. 259:18-260:1. MLP Saint-Preux "explained to [plaintiff] that I had the health services locked down and it was an extra effort or measure that I requested on his behalf so that the x-ray of his fingers could be done." *Id.* Plaintiff "refused to come down." Tr. 260:2-3. MLP Saint-Preux gave plaintiff a form to sign indicating that he had refused medical treatment, "for him to understand the seriousness of my attempt to have these x-rays done," and to relieve MLP Saint-Preux "from having to continuously ask the x-ray technician to pursue this x-ray request." Tr. 260:4-12; *see* Gov't Exh. D at USA 120. Plaintiff refused to sign the form. Tr. 260:13-15. His fingers were never x-rayed. *See* Gov't Exh. D.

### C. April 22, 2008

On April 22, 2008, plaintiff was housed in cell 917 of the MDC SHU. Tr. 58:17-59:2. Cell 917 was equipped with a biohazard slot. Tr. 210:15-20; *see* Gov't Exhs. A-1, A-2, H-3; Pl. Exhs. 7, 8, 9.

The MDC accounts for all inmates by conducting daily "stand-up" counts, one of which takes place at 4:00 p.m. Tr. 213:11-13,235:15-19. About 4:00 p.m. on April 22 Senior Officer

17

Specialist Shawn Lidicker and Correctional Officer Doe Brown approached plaintiff's SHU cell in order to conduct the inmate count. Tr. 211:17-25, 274:10-18.

Officer Lidicker has been employed by the Federal Bureau of Prisons for fourteen years. Tr. 269:8-10. He had received numerous awards as a federal corrections officer: he had been recognized as "rookie of the year" in his first year with the Bureau of Prisons; he has been named "correction officer of the year"; he has received a special act award for finding cocaine on an inmate; he has received a second special act award for finding "escape paraphernalia" while conducting rounds; and he has been recognized for finding a shank (knife-like object) on an inmate during a pat search. Tr. 271:1-7.

Brown and Lidicker were aware that plaintiff had a "history of assault." Tr. 313:5-21. Officer Brown testified that she had been warned to "be careful about" plaintiff because he had the tendency to "manipulate staff." Tr. 208:10-25. Although both Officers Lidicker and Brown had heard of plaintiff, neither had interacted with him before the afternoon of April 22, 2008. Tr. 208:13-14, 210:9-15, 211:5-7, 273:4-8.

When the officers approached plaintiff's cell, plaintiff asked to go to the law library. Tr. 62:11-16, 211:21-212:3, 274:10-18. Officer Brown testified that she and Officer Lidicker told plaintiff that they would take him to the law library after the inmate count. Tr. 211:21-212:3. They completed the inmate count, Tr. 213:14-17, 274:19-25, and reported to the OIC "that we were good on our count." Tr. 274:19-275:13.

After the count was completed, the officers were allowed to move inmates within the SHU. Tr. 275:14-20. Officer Brown testified that she and Officer Lidicker received permission from their lieutenant to take plaintiff to the law library. Tr.213:24-214:3.

18

The law library is "a multipurpose room with various legal materials" located within the SHU. Tr. 275:18-276:2. SHU inmates are locked into the law library, at which point their handcuffs are removed so that they can look at books and do research. *Id.*

SHU inmates must be handcuffed before being escorted from their cells to other locations in the SHU or to other parts of the institution. Tr. 62:22-23. The inmates are, as already noted, handcuffed through the slot on the cell door. Tr. 65:2-8.

Officers Lidicker and Brown returned to plaintiff's cell to take him to the SHU law library. *See* Tr. 274:17-25; *see also* Tr. 124:12-16, 213:3-17. Officer Lidicker opened both the metal slide and the plexiglas hatch and instructed plaintiff to turn around so he could be handcuffed. Tr. 276:11-14, *see also* 214:19-215:6. Plaintiff told Officer Lidicker that he needed to be double-cuffed due to an injury. Tr. 124:20-22, Tr. 215:14-18, 276:11-15. Double-cuffing entails interlocking two sets of handcuffs together to form a chain. *See* Tr. 63:14-16. The interlocked handcuffs allow more room between the inmate's shoulders. Tr. 64:4-6. After obtaining Officer Brown's handcuffs, Officer Lidicker interlocked his set and her sets of cuffs together. Tr. 125:4-25, 277:19-24.

In accordance with normal practice, Officer Lidicker instructed plaintiff to turn around with his back toward the cell door, and place his hands on the metal tray of the biohazard slot. Tr. 277:24-278:4. One cuff was applied to plaintiff's left wrist. Tr. 278:5-7. Officer Lidicker testified that he did not apply the cuff tightly. Tr. 278:11-15. Officer Brown, who had a clear view of the biohazard slot from behind Officer Lidicker, Tr. 239:22-240:21, testified that there was nothing unusual or inappropriate about the way Officer Lidicker applied the cuff to plaintiff's left wrist. Tr. 215:19-24, 232:1-7.

Officer Lidicker had learned how to apply handcuffs at the Federal Corrections Institution at Fort Dix, where he was stationed when he first began working for the Bureau of Prisons in 1995. Tr. 269:11-15, 272:2-4. Over the years, Officer Lidicker developed "a feel" for whether the cuffs were at the correct level of tightness. Tr. 272:19-22. Officer Brown—who was also trained regarding the appropriate manner to apply handcuffs—confirmed that over time, correctional officers learn to visualize whether or not cuffs are applied too tight. Tr. 216:23-218:6.

When Officer Lidicker applied the cuff to plaintiff's left wrist, plaintiff began loudly yelling and cursing. Tr. 68:11-16, 278:16-18. He spun around to face Officer Lidicker and continued yelling and cursing. Tr. 278:21-279:3. He did not ask Officer Lidicker to loosen the cuffs. Tr. 126:10-25.

Officer Lidicker's left hand was at his side, and his right hand was holding on to the chain of handcuffs attached to plaintiff's left wrist. Tr. 294:23-295:2. Officer Lidicker's right hand, plaintiff's cuffed left hand, and the interlocked set of handcuffs were resting on the metal shelf of the biohazard slot. Tr. 278:21-24, 295:3-11.

Officer Lidicker testified that plaintiff pulled his left hand, dragging the handcuffs and Officer Lidicker's right hand into the cell. Tr. 279:5-6, 302:19-23. Officer Brown observed Officer Lidicker's hand being pulled into plaintiff's cell. Tr. 218:13-219:4.

Plaintiff's account was different—he testified that he never pulled his hand or the handcuffs back into his cell and that Officer Lidicker's hand never entered the cell. Tr. 70:10-19, 81:3-20. The testimony of Officers Lidicker and Brown on this point was credible. A video

20

recording of the incident from a camera in the SHU hallway appeared to be consistent with their account. *See* Gov't Exh. G at 4:25:51-52.

Officer Lidicker released the handcuffs and quickly pulled his right arm back out of the cell. *See* Tr. 279:7-16. He testified that he let go of the cuffs and pulled his hand back because having his hand in plaintiff's cell "made me vulnerable." Tr. 279:17-24. He stated: "[M]y face is now looking lower into his cell and my hand is now into his cell and he still has a free hand and so plus he's facing me, so I didn't want to get assaulted." *Id.*

Plaintiff was standing in the cell with his right arm free and a double set of handcuffs hanging from his left wrist. Tr. 220:23-222:9; 279:25-280:7. Officer Lidicker reached for his keys, *see* Tr. 280:8-13, but he "constantly had visualization" of the biohazard slot. Tr. 280:18-24. Officer Lidicker did not observe any part of plaintiff's body protruding through the biohazard slot. Tr. 280:25-281:5, 307:17-24. He attempted to close the metal slide. Tr. 281:6-7. Officer Brown confirmed that "no body limbs" were in the biohazard slot when Officer Lidicker attempted to close the slide. Tr. 221:14-21.

Before Officer Lidicker could completely shut the metal slide, plaintiff stretched his hand outside of the cell, blocking the slide from closing. Tr. 222:10-223:2, 281:6-12. As a result of plaintiff's action, the metal slide made contact with plaintiff's arm. Tr. 284:13-25. There was conflicting testimony about the precise area of plaintiff's left wrist or arm that came into contact with the metal slide. Officer Brown testified that she saw plaintiff's fingers extended through the opening of the metal slide, but she did not observe the slide make contact with any part of plaintiff's body. Tr. 223:12-23. Plaintiff testified that the metal slide made contact with his

lower forearm, above the wrist. Tr. 71:2-11. Officer Lidicker testified that the slide made contact between plaintiff's wrist and hand. Tr. 284:15-25.

Plaintiff stated: "My hand," or "My hand is in the slot," or "My hand is stuck." Tr. 219:15-16, 222:20-223:2, 227:5-12. Plaintiff did not make any indication that he had been hurt. Tr. 227:13-24.

Officer Lidicker testified that he did not intentionally close the metal slide on any part of plaintiff's body. Tr. 289:12-14. His testimony on this point was credible. He stopped pushing the metal slide when he saw plaintiff's hand in the slot. Tr. 313:25-314:6. The one-way ratchet on the metal slide allows it to be pushed in the closed direction without a key; but the slide cannot be pulled open unless it is unlocked. Tr. 284:2-12. Officer Lidicker reached for his keys to unlock the metal slide and open it wider. Tr. 282:7-284:12. Before Officer Lidicker could unlock the metal slide, plaintiff pulled his hand back into the cell. Tr. 286:8-20.

Plaintiff testified that his left arm was in the opening of slot before Officer Lidicker began closing the metal slide and that the chain of handcuffs remained on the metal shelf. Tr. 70:2-22; 127:9-17. According to plaintiff, he did not pull his arm back into the cell until after the slide had made contact with his forearm. Tr. 72:8-16. Plaintiff testified that he then "dragged" the handcuffs back into the cell with him. Tr. 84:15-18. Plaintiff's version of events is contradicted by the testimony of Officers Brown and Lidicker, and appears to be inconsistent with the videotape of the incident. *See* Gov't Exh. G.

Once plaintiff's hand was inside the cell, Officer Lidicker closed the metal slide and the plexiglas hatch. Tr. 287:18-288:11. He and Officer Brown notified the lieutenant of the incident. Tr. 288:13-24, 225:22-226:9. Officer Brown testified that although plaintiff had

22

claimed only that his hand was "stuck," the proper procedure was for the officers to notify a lieutenant so that a medical assessment could be performed. Tr. 226:3-227:24.

Officer Brown saw plaintiff later that day when she and the lieutenant removed plaintiff from his cell. Tr. 228:2-11. At that time, Officer Brown observed plaintiff's left arm. Tr. 228:15. She described seeing a "little scrape," about one half of an inch long, on plaintiff's left forearm. Tr. 230:11-22.

After April 22, 2008, plaintiff never sought medical treatment for the alleged injury to his forearm. *See* Gov't Exh. D.

## V.     FTCA Claims

### A.     Law

#### 1.     Standard of Proof

In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence. *See, e.g., Securities and Exchange Comm. v. Lowy*, 396 F. Supp. 2d 225, 240 (E.D.N.Y. 2003). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Fischi v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (internal quotation marks omitted).

#### 2.     FTCA

The FTCA "waives the United States' sovereign immunity for certain classes of torts claims." *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 80 (2d Cir. 2005); *see also Fuentes v. Parks*, No. 03-2660, 2005 WL 911442, at *3 n.5 (S.D.N.Y. April 18, 2005) ("The FTCA 'does not apply to suits for violation of federal constitutional or statutory rights, but

provides government employees with immunity against claims of common-law tort.'") (quoting *Rivera v. United States,* 928 F.2d 592, 608 (2d Cir. 1991)).

Pursuant to the FTCA, prison inmates may bring claims against the United States for injury while in prison. 28 U.S.C. §§ 1346(b), 2671-2680. FTCA claims can only be brought against the United States, and not against federal employees individually. 28 U.S.C. § 2679(b)(1) ("The remedy against the United States . . . is exclusive of any other civil action or proceeding for money damages . . . against the employee whose act or omission gave rise to the claim. . . ."); *B & A Marine Co., Inc. v. American Foreign Shipping Co., Inc.,* 23 F.3d 709, 713 (2d Cir. 1994) ("To emphasize the exclusivity of the remedy against the United States under the FTCA, § 2679(d) requires that the United States be substituted as *the* party defendant upon certification by the Attorney General or the court that the defendant employee was acting within the scope of his employment." (emphasis in original)).

The FTCA provides that the federal district courts shall have exclusive jurisdiction over damages claims against the United States for injury or loss of property, or for personal injury or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The Act's purpose is both to allow recovery by people injured by federal employees or by agents of the federal government, and, at the same time, to immunize such employees and agents from liability for negligent or wrongful acts committed in the scope of their employment. *Celestine,* 403 F.3d at 80.

In determining the liability of the United States under the FTCA, courts apply the law of the state where the incident occurred. *See* 28 U.S.C. § 1346(b); *Hamm v. United States,* 483 F.3d

24

135, 139 (2d Cir. 2007). Because both of the incidents complained of occurred at the MDC, in Brooklyn, New York, the substantive law of New York applies.

### 3. Assault and Battery

Although assault and battery claims against the federal government are usually prohibited, such claims are permitted under the FTCA where federal law enforcement officers are alleged to have committed assault or battery. *See* 28 U.S.C. § 2680(h).

Under New York law, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (citing cases). A battery is "an intentional wrongful physical contact with another person without consent." *Id.*

### 4. Negligence

To prevail on a claim of negligence under New York law, a plaintiff must establish: "(1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged." *Crews v. County of Nassau*, 612 F.Supp.2d 199, 205 (E.D.N.Y. 2009). Under New York law, "[t]he mere happening of [an] accident does not establish liability on the part of the defendant." *Lewis v. Metropolitan Transp. Auth.*, 99 A.D.2d 246, 251 (N.Y. App. Div. 1984), *aff'd* 64 N.Y.2d 670 (1984).

"[F]or liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988)

(internal quotation marks and citations omitted). "The FTCA's 'law of the place' requirement is not satisfied by direct violations of the Federal Constitution, or of federal statutes or regulations standing alone." *Id.* (citations omitted).

### B. Application of Law to Facts

#### 1. Assault and Battery

To the extent the complaints in either *Brown v. Lindsay* or *Brown v. Lidicker* can be construed to allege the intentional torts of assault or battery, they fail. Plaintiff failed to meet his burden of proving that Officer Reed committed the intentional torts of assault or battery. Officer Reed testified that he did not intend to close the plexiglas hatch, let alone to close it on plaintiff's hand. Tr. 149:8-10, 154:3-5, 182:9-13. It was undisputed that prior to November 16, 2007, Officer Reed had never interacted with plaintiff. Tr. 153:10-12. Officer Reed testified credibly that he bore no animus toward plaintiff; he had no reason to punish plaintiff, and he made no attempt to hurt plaintiff. Tr. 153:13-21. Plaintiff did not see Officer Reed's actions and was not in a position to assess whether Officer Reed intentionally closed the plexiglas hatch on his fingers. Tr. 115:3-10. Plaintiff testified: "I clear[ly] stated that I had never said that it was intentional or that it wasn't." Tr. 115:6-7.

Plaintiff failed to meet his burden of proving that Officer Lidicker committed the intentional torts of assault or battery. The testimony of Officers Lidicker and Brown concerning the April 22, 2008 incident was credible, and contradicted plaintiff's account. Officers Lidicker and Brown both testified that at the point when Officer Lidicker began closing the metal slide, no part of plaintiff's body was protruding through the biohazard slot. Tr. 221:14-21, 280:18-281:5, 307:17-24. The officers also testified that after Officer Lidicker had begun sliding the metal

26

door shut, plaintiff reached his hand outside of the cell to block the slide from closing. Tr. 222:10-223:2, 281:6-12. Plaintiff's hand or forearm made contact with the metal door as a result of his suddenly putting his hand through the slot, not as a result of any intentional effort by Officer Lidicker to injure the arm in the biohazard door. *See* Tr. 284:13-25.

Plaintiff has failed to meet his burden of proving that an assault or battery occurred on either November 16, 2007 or April 22, 2008.

### 2. Negligence

To the extent the complaints in either *Brown v. Lindsay* or *Brown v. Lidicker* can be construed to allege negligence, they fail. Plaintiff has not articulated any duty Officers Reed and Lidicker owed to him, other than their duty to exercise reasonable care. The evidence did not establish that either of the officers breached that duty.

With respect to the November 16, 2007 incident, there was no evidence that the plexiglas hatch fell as a result of negligence by Officer Reed. The manner in which Officer Reed attempted to remove his key from the lock on the plexiglas hatch was reasonable. There are no written policies dictating the method by which correctional officers must open and close biohazard slots. Tr. 150:17-151:6.

It was conceded that inmates in the SHU are not allowed to place their hands outside of the biohazard slots. Tr. 115:20-23. Plaintiff stated that he intentionally put his hand outside of the biohazard slot in order to prevent it from being closed, and that he was aware that he could be "written up" for doing this. Tr. 113:19-22, 116:1-7.

Prior to falling forward, the plexiglas hatch was leaning toward Officer Reed's body. Tr. 152:8-18, 187:10-19. Officer Reed testified that he expected that if the hatch fell, it would fall

27

toward him. Tr. 173:15-18, 176:22-177:7. Instead, the hatch fell forward. Tr. 147:10-12, 149:4-22. Plaintiff did not witness Officer Reed's actions that resulted in the hatch falling forward, and offered no evidence that there was any negligence on the officer's part. *See* Tr. 115:3-10. Officer Reed was not shown to have breached his duty of care owed to plaintiff. Plaintiff failed to meet his burden of proving his claim of negligence with respect to the incident on November 16, 2007.

The contact of the metal slide door against plaintiff's arm on April 22, 2008 was not the result of negligence by Officer Lidicker. Plaintiff's forearm made contact with the metal slide because plaintiff purposely and improperly reached his hand out to block the slide from closing. Tr. 222:10-223:2, 281:6-12. Officer Lidicker did not breach the duty of care he owed plaintiff. Plaintiff failed to meet his burden of proving his claim of negligence with respect to the incident on April 22, 2008.

## VI.   *Bivens* Claims

### A.   Law

#### 1.   Summary Judgment

"Summary judgment is appropriate only if there is no genuine issue as to any material fact, Fed. R. Civ. P. 56(c), and the moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Baisch v. Gallina*, 346 F.3d 366, 371 (2d Cir. 2003). When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. *Id. See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Sledge v. Kooi*, 556 F.3d 137, 140 (2d Cir. 2009).

28

In order to survive a motion for summary judgment, the non-movant must offer "specific facts showing that there is a *genuine issue for trial.*" *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (emphasis in original). To do so, the non-movant must do more than present evidence that is merely "colorable" or "not significantly probative." *Anderson*, 477 U.S. at 249. *See also Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) ("[M]ere existence of factual issues-where those issues are not material to the claims before the court-will not suffice to defeat a motion for summary judgment.").

### 2. Claims for Constitutional Violations

"[W]hen the plaintiff proceeds *pro se* . . . a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). "In a *Bivens* action, alleged victims of constitutional violations by federal officials may recover damages despite the absence of any statute specifically conferring such a cause of action." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994).

Plaintiff pled guilty on January 7, 2008, and sentence was imposed on April 21, 2008. *United States v. Brown*, No. 07-CR-202, 2008 WL 1945365, at *1 (E.D.N.Y. Apr. 29, 2008). Plaintiff was a pre-trial detainee at the time of the November 16, 2007 incident, and was a convicted prisoner at the time of the April 22, 2008 incident. The due process clause of the Fifth Amendment applies to claims by pre-trial detainees of excessive force and of deliberate indifference to medical needs. The standard under the due process clause of the Fifth Amendment is at least equal to that of the Eighth Amendment for convicted prisoners. *See, e.g.,*

29

*Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("The rights of one who has not been convicted are protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner.").

Although a plaintiff need not show serious injury in order to prove an Eighth Amendment excessive force claim, he must show that force was used "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10 (internal citations and quotation marks omitted).

Eighth Amendment *Bivens* claims may properly be brought for deliberate indifference to the serious injury or illness of a prisoner. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. "[D]eliberate indifference describes a state of mind more blameworthy than negligence," akin to recklessness. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994). Absent additional factors, an inadvertent failure to provide care does not support a claim of deliberate indifference. "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105.

30

As a prerequisite to recovery against a defendant under *Bivens*, a plaintiff must allege that defendant's personal involvement in the alleged constitutional violation. "Because vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009).

### 1.     Sovereign and Qualified Immunity

Suits against prison staff in their official capacities for constitutional tort claims are barred by sovereign immunity. *See Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts[.]"); *see also Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 368-69 (E.D.N.Y. 2005) (discussing sovereign immunity bar to official capacity *Bivens* claims).

Where prison employees are sued in their individual capacities, they may be entitled to qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 736-39 (2002) (if plaintiff's allegations, assumed true, would establish a constitutional violation, "respondents may nevertheless be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (internal quotation marks and citations omitted).

Where a complaint fails to state whether defendants employed by the government are sued in their official or their individual capacities, the court may assume that the suit is brought against defendants in their individual capacities. *See Davis v. County of Nassau*, 355 F. Supp. 2d 668, 675-76 (E.D.N.Y. 2005).

31

### B. Application of Law to Facts

#### 1. Claims for Constitutional Violations

Summary judgment in favor of the defendants is proper on the merits as to plaintiff's *Bivens* claims with respect to both of the incidents he complains of. The record before the court demonstrates that there is no genuine issue as to any material fact, and that no view of the evidence could support plaintiff's claims.

#### a) November 16, 2007 Incident

Plaintiff's complaint concerning the November 16, 2007 incident fails to set forth allegations that would constitute a Fifth Amendment constitutional violation of excessive force. The evidence on summary judgment and at trial on the FTCA claims does not support such a claim. There is no basis for concluding that Officer Reed applied force intentionally, or "maliciously and sadistically to cause harm." *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

The medical records and the evidence at trial on the FTCA claims do not support plaintiff's claim of deliberate indifference to his medical condition or denial of medical care in violation of the Fifth Amendment. They demonstrate that plaintiff was promptly provided medical treatment soon after the incident and that it was plaintiff who refused follow-up medical care. There are no disputed issues of material fact, which, if decided in plaintiff's favor, could support a finding by a jury of a constitutional violation. Plaintiff has also failed to demonstrate that any of these defendants were personally involved in any deliberate indifference or denial of medical care.

32

Plaintiff does not allege that defendant Warden Lindsay was personally involved in any alleged violation. Because the doctrine of *respondeat superior* has no application in *Bivens* actions, there is no claim against Warden Lindsay that can survive dismissal.

### a)    April 22, 2008 Incident

Plaintiff's complaint concerning the April 22, 2008 incident is not supported by evidence of an Eighth Amendment violation. Even if plaintiff's assertion that the incident was not an accident were to be credited, the force involved was *de minimis* and not "repugnant to the conscience of mankind." *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).

The medical records do not support plaintiff's claims of deliberate indifference to his medical condition or denial of medical care in violation of the Eighth Amendment. There is no evidence to suggest that plaintiff sustained an injury that required medical attention. Plaintiff has also failed to show that either of these defendants was personally involved in any deliberate indifference or denial of medical care.

Plaintiff does not allege that defendant Warden Lindsay was personally involved in any alleged violation; because the doctrine of *respondeat superior* has no application in *Bivens* actions, there is no claim against Warden Lindsay that can survive dismissal.

### 2.    Sovereign and Qualified Immunity

Plaintiff's complaints in both *Brown v. Lindsay* and *Brown v. Lidicker* do not specify whether the defendants are sued in their individual or official capacities. All *Bivens* claims brought against the defendants in their official capacities must be dismissed since sovereign immunity is not waived under *Bivens*. Construing the *pro se* compliant liberally and in the light

most favorable to the plaintiff, the court assumes the defendants are being sued in their individual capacities. Sovereign immunity is not a reason for dismissal.

The defendants in these cases are entitled to qualified immunity because plaintiff's allegations do not set forth a violation of any constitutional right. *See* Part VI.B.1, *supra.*

## VII.  Conclusion

Based on the evidence, plaintiff has not met his burden of proof with respect to his FTCA claims. Verdicts in favor of the defendants are entered on those claims in both of the above-captioned cases.

Plainitiff's *Bivens* claims are without merit. The court has considered the record on summary judgment and the evidence presented at trial on the FTCA claims. Summary judgment in favor of the defendants is warranted on the *Bivens* claims in both of the above-captioned cases.

Both cases are dismissed on the merits. No costs or disbursements are awarded. The pros se clerk of the court shall assist the plaintiff in protecting his right to appeal, should he wish to appeal.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: March 16, 2010
      Brooklyn, New York